## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

_____

|  |  |
|---|---|
| MARYALICE BRADISH, FOR HERSELF AND ALL OTHERS SIMILARLY SITUATED, | ) ) ) ) ) |
| PLAINTIFF, | ) ) ) CIVIL ACTION NO. 1:14-cv-14123-DJC |
| v. | ) ) |
| GENZYME CORPORATION, | ) ) |
| DEFENDANT. | ) ) |

_____)

## PLAINTIFF'S FIRST AMENDED FEDERAL COMPLAINT AND DEMAND FOR JURY TRIAL

### INTRODUCTION

The Plaintiff, MaryAlice Bradish, by and through her attorneys, for herself and all others similarly situated, complaining of the Defendant, Genzyme Corporation, alleges breach of contract, breach of the covenant of good faith and fair dealing, violations of Mass. Gen. Laws ch. 149, 151, and 151B, wrongful termination and violation of the Massachusetts Declaration of Rights as follows:

### PARTIES

1. The Plaintiff ("Plaintiff" or "Bradish") is an individual residing in Lawrence, Essex County, Massachusetts.

2. Genzyme Corporation ("Genzyme") is a for profit corporation incorporated in Massachusetts and having a principal place of business in Cambridge, Suffolk County, Massachusetts.

3. Genzyme regularly conducts business within Massachusetts.

**FEDERAL JURISDICTION AND VENUE**

4. The action involves no federal question or diversity jurisdiction.

5. Accordingly, federal subject matter jurisdiction is absent and the case should be remanded to Middlesex Superior Court.

**FACTS**

6. Bradish was born in 1962

7. Bradish was hired to work at Genzyme on January 31, 2011.

8. Bradish was hired under an implied contract of employment.

9. Bradish was bound by the provisions of Genzyme's employee manual.

10. Bradish was required to work and perform the duties of a Senior Training Specialist.

11. In return for Bradish's work efforts, Genzyme was to pay Bradish an agreed salary and abide by all relevant employment statutes.

12. To information and belief, Bradish's supervisor, Joanna Gallant, directed her staff to record their actual hours worked to demonstrate the need for additional personnel.

13. Bradish's actual work hours were initially recorded by the Ceridian Tracking System from about January 2011 until August 2011 pursuant to Gallant's directive.

14. Bradish recorded her actual hours worked under the username 112404 and the customer ID of SANOFI with changing passwords every six months.

15. Bradish worked 50-70 hours per week as reflected in the Ceridian Tracking System.

16. Other employees also worked over 40 hours a week as reflected in the Ceridian Tracking System.

17. Other nonsupervisory workers earning less than $100,000 per year worked over 40 hours a week and were not paid for the overtime.

18. Bradish frequently had to work over eight hours a day to meet with second shift manufacturing personnel.

19. Other personnel had to work over eight hours a day to meet with second shift manufacturing personnel.

20. Bradish was not paid overtime wages as reflected in the records of the Ceridian Tracking System.

21. In about August 2011, Gallant's replacement as interim supervisor, William O'Connor, who was the head of Training and Development, directed Bradish and others to stop recording their actual hours worked in the Ceridian Tracking System.

22. Bradish had no creative duties.

23. Bradish had no executive duties.

24. Bradish had no administrative duties.

25. Bradish had no managerial duties.

26. Bradish had no professional duties.

27. Bradish had no outside sales duties.

28. Bradish was not a janitor or caretaker of residential property.

29. Bradish was not a golf caddy, newsboy or child actor or performer.

30. Bradish was not a learner or apprentice.

31. Bradish was not a fisherman or as a person employed in the catching or taking of any kind of fish, shellfish or other aquatic forms of animal and vegetable life.

32. Bradish was not a switchboard operator in a public telephone exchange.

33. Bradish was not a driver or helper on a truck with respect to whom the Interstate Commerce Commission has power to establish qualifications and maximum hours of service pursuant to the provisions of section two hundred and four of the motor

carrier act of nineteen hundred and thirty-five, or as employee of an employer subject to the provisions of Part 1 of the Interstate Commerce Act or subject to title II of the Railway Labor Act.

34. Bradish was not in a business or specified operation of a business which is carried on during a period or accumulated periods not in excess of one hundred and twenty days in any year, and determined by the commissioner to be seasonal in nature.

35. Bradish was not a seaman.

36. Bradish did not work for an employer licensed and regulated pursuant to chapter one hundred and fifty-nine A.

37. Bradish did not work in a hotel, motel, motor court or like establishment.

38. Bradish did not work in a gasoline station.

39. Bradish did not work in a restaurant.

40. Bradish was not as a garageman, which term shall not include a parking lot attendant.

41. Bradish did not work in a hospital, sanitorium, convalescent or nursing home, infirmary, rest home or charitable home for the aged.

42. Bradish did not work in a non-profit school or college.

43. Bradish did not work in a summer camp operated by a non-profit charitable corporation.

44. Bradish did not work as a laborer engaged in agriculture and farming on a farm.

45. Bradish did not work in an amusement park containing a permanent aggregation of amusement devices, games, shows, and other attractions operated during a period or accumulated periods not in excess of one hundred and fifty days in any one year.

46. Bradish was paid less than $100,000 per year.

47. Bradish has severe osteoarthritis of both knees.

48. Bradish was and is fully capable of performing all the essential functions of her job.

49. Bradish was forced for the first year to climb two flights of stairs to her second floor assigned desk over twenty times a day.

50. The only break room or rest room was on the first floor in the California Avenue building.

51. Bradish told her supervisor she had difficulty climbing stairs due to the knee arthritis.

52. One evening, Bradish fell and reported the fall to her supervisor.

53. Bradish asked for an accommodation of a first floor desk/office.

54. Eventually, Bradish was given a first floor desk/office.

55. Bradish now requires two total knee replacements.

56. Bradish teaches classes.

57. Bradish could not stand for the full length of the classes she taught and asked for an accommodation of being allowed to sit for portions of the classes.

58. In January 2012, Bradish was diagnosed with Barrett's Esophagus and early esophageal cancer. Bradish underwent ablation therapy in March 2012 and developed pneumonia in May 2012 and was unable to work and applied for and was granted FMLA. After receiving a second ablation treatment in mid-May, Bradish developed breathing complications and had to take steroids which increased her blood sugars. Her next treatment was in July coupled with more complications. Bradish was cleared to return to work half days in early August.

59. Bradish's supervisor would not let her return to work until she was at full unrestricted duty.

60. On August 13, 2012, Bradish returned to work full duty.

61. Upon return to work Bradish had to catch up on hundreds of E-mails and self-train to get up-to-date, which she accomplished within a week.

62. Bradish performed her required Mid-Year Self Evaluation and delivered it to her supervisor on August 20, 2012.

63. There was no acknowledgement, discussion, or E-mail regarding Bradish's Mid-Year Self Evaluation.

64. Bradish's doctor told her to limit her work to a normal 40 hour work week.

65. Bradish's supervisor told her it was an unwritten rule that salaried employees should work over 40 hours a week.

66. When Bradish returned to work, all the customers she had been working with for months were reassigned to another trainer. Bradish had only one department of customers.

67. In her department, there were five employees. Two were under 40 years old and three were over 40 years old. All the employees over 40 years old were harassed by a supervisor under 40 years old.

68. Bradish and one other woman over 40 years old were repeatedly criticized and excluded from several meetings and professional development opportunities.

69. Bradish and the other woman approached the supervisor to complain but the workplace became more tense and hostile and the other woman ultimately was forced to leave.

70. Bradish filed an age and disability discrimination complaint with Human Resources against the supervisor.

71. An investigation was conducted but found no evidence to support Bradish's allegations but Bradish was promised there would be no retaliation.

72. However, after the complaint, no one in the group spoke to Bradish except to say a hello if she was face to face or if there was direct eye contact. Bradish offered to help with work but was dismissed.

73. Later in August, Bradish was told she would need to be observed teaching as part of the Trainer Evaluation Program.

74. Bradish requested to be observed by someone other than her supervisor since Bradish felt the supervisor would be biased. The request was denied.

75. During the teaching evaluation, Bradish's supervisor was on her Blackberry/computer and left the room to attend at least two other meetings.

76. Bradish's supervisor failed Bradish on Bradish's evaluation alleging Bradish had not done some things that had indeed been done when the supervisor was focused on her computer/Blackberry or out of the room. The evaluation did not use the Official Observation Form but was only a subjective memo from Bradish's supervisor.

77. Bradish's supervisor also commented on Bradish's inability to stand.

78. Because of the evaluation, Bradish was not allowed to teach classes.

79. A new person transferred into Bradish's department and Bradish attempted to orient the new person whenever possible since little guidance had been provided by Bradish's supervisor.

80. That new person referenced in paragraph 79 was told Bradish would be gone from the company in a few months.

81. That new person referenced in paragraph 79 was asked to spy on Bradish but refused to do so.

82. That new person referenced in paragraph 79 transferred back to her former department due to the hostile environment in Bradish's department.

83. Bradish had put in for tuition reimbursement to attend a professional development course and received approval.

84. Bradish completed the course with a B+ grade entitling her to tuition reimbursement.

85. Bradish was denied her reimbursement when she requested it in October 2012.

86. Bradish was told anyone with a performance issue could not receive tuition reimbursement or transfer to another department.

87. Two days later on October 19, 2012, Bradish received her Mid Year Review with her supervisor and site head.

88. Bradish disputed most of the review as inaccurate. Only one of the sub-performance problems had ever been discussed with Bradish. Bradish declined to sign the document.

89. Bradish was told she would be put on a performance plan to be set up.

90. The under 40 years old members of her department were given preference over the over 40 years old members.

91. Bradish was discriminated against because of her osteoarthritis and inability to stand for long periods of time and because of her age.

92. Bradish was retaliated against for requesting accommodations and because of her age.

93. Bradish filed a second complaint with Human Resources alleging retaliation in the review process.

94. Bradish's attorney contacted Sanofi US about concerns of failure to comply with current good manufacturing practices (CGMP) that threaten patient safety and are in violation of federal statutory regulations as well as in opposition to the FDA's efforts through the Consent Decree and Quantic monitoring program to ensure that Genzyme's product line can be trusted.

95. Bradish's attorney related an incident in which a hose came into contact with the epoxy-painted floor in a manufacturing area and caused paint to nearly enter into the drug product. It is unknown if the same process failure may have occurred and contaminated any drugs.

96. In addition, Bradish's attorney described serious issues of potential contamination from peeling paint and other risks that do not seem to have been addressed or reported to Quantic Group for review.

97. Bradish's attorney also encouraged a review of the Framingham facility by a plant manager well-versed in CGMP to augment and evaluate the effectiveness of Quantic Group's reports from the Allston facility.

98. In addition, Bradish complained to the company that a glass pipette that is normally used to aspirate and transfer fluids from one container to another was broken in half and used to pour final drug product through into a container. This technique risked glass shards ending up in product being sent out to patients for injection.

99. Bradish was retaliated against and terminated from her job in part because of her efforts to ensure patient safety and compliance with federal regulations.

100. Bradish filed a Wage Complaint with the Massachusetts Attorney General and was granted a private right of action.

101. Bradish filed a Complaint with the Massachusetts Commission Against Discrimination alleging age and disability discrimination, harassment, hostile work environment, and retaliation for seeking to redress her grievances through the company.

102. Shortly after Bradish's MCAD Complaint was filed, she was terminated from the company in retaliation for her filing the Complaint and for her efforts to protect patients by ensuring the quality of the drugs manufactured.

103. Genzyme avers that Bradish violated its policy on Workplace Violence Prevention.

104. After the averred incident of alleged workplace violence, Bradish was allowed to work an additional half day unsupervised.

105. Bradish did not commit an assault while at Genzyme.

106. Bradish did not commit a battery while at Genzyme.

107. Bradish was not charged with assault or battery while at Genzyme.

108. There was never a police investigation of the averred incident of alleged workplace violence.

109. Bradish subsequently moved to amend her MCAD Complaint to add retaliation for terminating her within a few months after the filing the MCAD Complaint since it was directly related to the initial MCAD filing.

110. Genzyme opposed the amendment of the MCAD Complaint.

111. MCAD allowed the Amended Complaint in spite of the opposition.

112. Bradish then filed suit in Middlesex Superior Court

113. Genzyme removed the case to Federal Court for the District of Massachusetts.

## CLASS ACTION CERTIFICATION

114. Plaintiffs seek to represent a class pursuant to Mass. R. Civ. P. 23 with respect to each of the claims below, consisting of:

> All nonsupervisory persons who worked for the Defendant, were classified as exempt from overtime wages, and earned less than $100,000 per year.

The proposed class may include subclasses. In the event that discovery shows, or the Court determines, that the proposed class cannot satisfy Mass. R. Civ. P. 23, Plaintiff may propose to modify or narrow the definition of the class or any subclass.

115. NUMEROSITY: The number of persons in the class is estimated to exceed one hundred. It would be impracticable to bring all, or even a substantial percentage of, such persons before the Court as individual plaintiffs through joinder.

116. COMMONALITY: There are questions of law and fact common to the class. The two overarching questions of law and fact common to all members of the class are that they worked for the Defendant, were not supervisory personnel, were classified as exempt from overtime wages, earned less than $100,000 per year and were not paid for the hours worked according to Massachusetts wage laws.

117. TYPICALITY: The claims of the Plaintiff are typical of the claims of all class members because Defendant has subjected Plaintiff and the class to the same unfair business practices of misclassifying workers as exempt when they are not exempt and not paying for all hours worked.

118. ADEQUACY OF REPRESENTATION: Plaintiff is a fair and adequate representatives of the class because:

    a. Plaintiff is willing to and able to represent the proposed class and has every incentive to pursue this action to a successful conclusion.

    b. Plaintiff's interests are not in any way antagonistic to those of the other class members.

c. Plaintiff is represented by counsel competent and ready to pursue litigating a major class action involving breach of contract, and violation of state wage laws.

119. PROPRIETY OF MAINTENANCE OF CLASS ACTION UNDER MASS. R. CIV. P. 23(b): Class action status is appropriate under Mass. R .Civ. P. 23(b) because Defendant has acted on grounds generally applicable to the class, thereby making declaratory and injunctive relief appropriate with respect to the class as a whole. Class action is also appropriate under Mass. R. Civ. P. 23(b) because the common questions of law and fact identified above predominate over questions affecting only individual members. A class action is superior to other available methods for the fair and efficient adjudication of this litigation. All members of the class were subjected to the same unfair business practices. Requiring each class member to pursue his or her claim individually would entail needless duplication and would waste the resources of both the parties and the Court. The financial burden of proving that Defendant engaged in such a practice also would make the prosecution of individual actions virtually impossible for most, if not all, members of the class.

## COUNT I
## BREACH OF CONTRACT

120. Plaintiff repeats and re-alleges ¶¶ 1-119 above and incorporates them herein by reference.

121. The contract of employment between Bradish and Genzyme bound them to its terms.

122. Bradish was entitled to wages for all hours worked and statutory overtime pay.

123. Bradish was denied wages for all hours worked and overtime pay.

124. Bradish was terminated in part for complaining about Genzyme's failure to adhere to CGMP and the consent decree placing the public at risk.

125. Bradish was terminated in part as additional retaliation for filing a Complaint with the MCAD about age and disability discrimination, retaliation, harassment, and a hostile work environment.

126. Bradish was terminated in violation of the verbal and implied contracts of employment and company policies.

127. WHEREFORE Plaintiff demands judgment on Count I as follows:

    a. Payment of wages for all hours worked;

    b. Payment of overtime wages;

    c. Triple damages;

    d. Punitive damages;

    e. Interest, costs, and attorneys' fees;

    f. An injunction barring Defendant from violating Massachusetts wage and discrimination statutes in the future;

    g. Such additional orders as this Honorable Court may deem fair and just.

## COUNT II
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

128. Plaintiff repeats and re-alleges ¶¶ 1-127 above and incorporates them herein by reference.

129. Implied in every contract is the Covenant of Good Faith and Fair Dealing.

130. By failing to follow the verbal and implied contracts of employment, and thus breaching the contract, Defendant has also breached the Covenant of Good Faith and Fair Dealing.

131. WHEREFORE Plaintiff demands judgment on Count II as follows:

      a. Payment of wages for all hours worked;

      b. Payment of overtime wages;

      c. Triple damages;

      d. Punitive damages;

      e. Interest, costs, and attorneys' fees;

      f. An injunction barring Defendant from violating Massachusetts wage and discrimination statutes in the future;

      g. Such additional orders as this Honorable Court may deem fair and just.

## COUNT III
## VIOLATION OF MASS. GEN. LAWS CH. 149

132. Plaintiff repeats and re-alleges ¶¶ 1 through 131 above and incorporates them herein by reference.

133. Bradish was entitled to wages for all hour worked.

134. Bradish was denied payment for all hours worked.

135. Bradish was denied overtime pay.

136. Genzyme knew or should have known that failure to pay wages consistent with Mass. Gen. Laws ch. 149 and ch. 151 is a violation of law.

137. WHEREFORE Plaintiff demands judgment on Count III as follows:

      a. Payment of wages for all hours worked;

      b. Payment of overtime wages;

      c. Triple damages;

      d. Punitive damages;

      e. Interest, costs, and attorneys' fees;

f. An injunction barring Defendant from violating Massachusetts wage statutes in the future;

g. Such additional orders as this Honorable Court may deem fair and just.

## COUNT IV
## VIOLATION OF MASS. GEN. LAWS CH. 151

138. Plaintiff repeats and re-alleges ¶¶ 1 through 137 above and incorporates them herein by reference.

139. Bradish was entitled to wages for all hour worked.

140. Bradish was denied payment for all hours worked.

141. Bradish was entitled to statutory overtime pay.

142. Bradish was denied overtime pay.

143. Genzyme knew or should have known that failure to pay wages consistent with Mass. Gen. Laws ch. 149 and ch. 151 is a violation of law.

144. WHEREFORE Plaintiff demands judgment on Count IV as follows:

a. Payment of wages for all hours worked;

b. Payment of overtime wages;

c. Triple damages;

d. Punitive damages;

e. Interest, costs, and attorneys' fees;

f. An injunction barring Defendant from violating Massachusetts wage statutes in the future;

g. Such additional orders as this Honorable Court may deem fair and just.

## COUNT V
## WRONGFUL TERMINATION

145. Plaintiff repeats and re-alleges ¶¶ 1 through 144 above and incorporates them herein by reference.

146. Bradish complained about the failure to pay overtime wages.

147. Bradish complained about discrimination.

148. Bradish filed an internal complaint about unlawful discrimination with Genzyme.

149. Bradish filed a Complaint with MCAD.

150. Bradish's attorney, on behalf of Bradish, contacted Sanofi US about concerns of failure to comply with current good manufacturing practices (CGMP) that threaten patient safety and are in violation of federal statutory regulations as well as in opposition to the FDA's efforts through the Consent Decree and Quantic monitoring program to ensure that Genzyme's product line can be trusted.

151. Bradish's attorney, also on behalf of Bradish, related an incident in which a hose came into contact with the epoxy-painted floor in a manufacturing area and caused paint to nearly enter into the drug product. It is unknown if the same process failure may have occurred and contaminated any drugs.

152. In addition, Bradish's attorney, again on behalf of Bradish, described serious issues of potential contamination from peeling paint and other risks that do not seem to have been addressed or reported to Quantic Group for review.

153. Bradish's attorney, on behalf of Bradish, also encouraged a review of the Framingham facility by a plant manager well-versed in CGMP to augment and evaluate the effectiveness of Quantic Group's reports from the Allston facility.

154. Bradish was retaliated against and terminated from her job in part because of her complaints about the failure to pay overtime wages, in part in retaliation for her efforts to ensure patient safety and compliance with federal regulations by complaining about Genzyme's failure to adhere to CGMP and the consent decree which placed the public at risk, and in part for exercising her rights under MCAD both by complaining internally and by filing an MCAD Complaint.

155. WHEREFORE Plaintiff demands judgment on Count IV as follows:

    a. Reinstatement to her job;

    b. Payment of all lost wages;

    c. Payment of wages for all hours worked;

    d. Payment of overtime wages;

    e. Triple damages;

    f. Punitive damages;

    g. Interest, costs, and attorneys' fees;

    h. An injunction barring Defendant from violating Massachusetts wage and discrimination statutes in the future;

    i. Such additional orders as this Honorable Court may deem fair and just.

**COUNT VI**
**AGE DISCRIMINATION, AGE DISCRIMINATION HOSTILE WORK ENVIRONMENT, HANDICAP DISCRIMINATION AND RETALIATION IN VIOLATION OF MASS. GEN. LAWS CH. 151B, §§ 4(1), 4(1)(B),  4(4), 4(4)(A), 4(16)**

156. Plaintiff repeats and re-alleges ¶¶ 1-155 above and incorporates them herein by reference.

157. Bradish was discriminated against due to her age and handicaps.

158. Bradish was subjected to a hostile work environment.

159. Bradish was retaliated against due to her exercise of her rights under Mass. Gen. Laws ch. 151B within Genzyme.

160. Bradish was retaliated against due to her filing of her MCAD Complaint and terminated in part as retaliation for filing a Complaint with the MCAD about age and disability discrimination, retaliation, harassment, and a hostile work environment.

161. WHEREFORE Plaintiff demands judgment on Count IV as follows:

      a.  Reinstatement to her job;

      b.  Payment of all lost wages;

      c.  Emotional damages;

      d.  Payment of wages for all hours worked;

      e.  Payment of overtime wages;

      f.  Triple damages;

      g.  Punitive damages;

      h.  Interest, costs, and attorneys' fees;

      i.  An injunction barring Defendant from violating Massachusetts wage and discrimination statutes in the future;

      j.  Such additional orders as this Honorable Court may deem fair and just.

## COUNT VII
## VIOLATION OF THE MASACHUSETTS DECLARATION OF RIGHTS

162. Plaintiff repeats and re-alleges ¶¶ 1-161 above and incorporates them herein by reference.

163. Bradish was discriminated against due to her age and handicaps.

164. Bradish was subjected to a hostile work environment.

165. Bradish was retaliated against due to her exercise of her rights under Mass. Gen. Laws ch. 151B within Genzyme.

166. Bradish was retaliated against due to her filing of her MCAD Complaint and terminated in part as retaliation for filing a Complaint with the MCAD about age and disability discrimination, retaliation, harassment, and a hostile work environment.

167. WHEREFORE Plaintiff demands judgment on Count IV as follows:

    a. Reinstatement to her job;

    b. Payment of all lost wages;

    c. Emotional damages;

    d. Payment of wages for all hours worked;

    e. Payment of overtime wages;

    f. Triple damages;

    g. Punitive damages;

    h. Interest, costs, and attorneys' fees;

    i. An injunction barring Defendant from violating Massachusetts wage and discrimination statutes in the future;

    j. Such additional orders as this Honorable Court may deem fair and just.

### DEMAND FOR JURY TRIAL

The Plaintiff demands a jury trial for all issues so triable.

MaryAlice Bradish
Plaintiff,
By her attorneys,

WALTER H. JACOBS
BBO # 672106
wjacobslaw@gmail.com

                           _____

ALEXANDRIA A. JACOBS
BBO # 682114
ajacobslaw@gmail.com

W. Jacobs and Associates at Law, L.L.C.
795 Turnpike Road
North Andover, MA 01845
978-688-0900

Dated: December 1, 2014

## CERTIFICATE OF SERVICE

       I hereby certify, in compliance with Local Rule 5.2(b), that this document(s) filed through the EFC system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on this date.


                           /s/ Walter H. Jacobs\_\_\_
DATED: December 1, 2014        WALTER H. JACOBS